**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Knights Franchise Systems, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KNIGHTS FRANCHISE SYSTEMS, INC., a Delaware Corporation, | : |
| Plaintiff, | : Civil Action No. 15- |
| v. | : |
| LAXMI KRUPA, INC., a Georgia corporation; and BHANUPRASOD MEHTA , also known as BHANO MEHTA, an individual, | : **VERIFIED COMPLAINT** |
| Defendants. | : |

Plaintiff Knights Franchise Systems, Inc., by its attorneys, LeClairRyan, complaining of defendants Laxmi Krupa, Inc., and Bhanuprasod Mehta, also known as Bhano Mehta, says:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Knights Franchise Systems, Inc. ("KFS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

KFS 10608
17248242v1
238389.1509

2.      Defendant Laxmi Krupa, Inc. ("Laxmi Krupa"), on information and belief, is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business at 601 West Central Avenue, Lenox, Georgia 31637.

3.      Defendant Bhanuprasod Mehta, also known as Bhano Mehta ("Mehta"), on information and belief, is a member of Laxmi Krupa and a citizen of the State of Georgia, residing at 601 West Central Avenue, Lenox, Georgia 31637.

4.      Upon information and belief, Mehta is the only constituent member of Laxmi Krupa.

5.      The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over Laxmi Krupa by virtue of, among other things, section 17.4 of the July 3, 1998 franchise agreement by and between Laxmi Krupa and KFS (the "Franchise Agreement"), described in more detail below, pursuant to which Laxmi Krupa has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

8.     This Court has personal jurisdiction over Mehta by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Mehta acknowledged that he was personally bound by section 17 of the Franchise Agreement.

9.     Venue is proper in this District pursuant to section 17.4 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Laxmi Krupa of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Knights® Marks

10.    KFS is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

11.    KFS owns and has the exclusive right to license the use of the service mark KNIGHTS® and various related trade names, trademarks and service marks (certain of which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Knights® Marks"), as well as the distinctive Knights® System, which provides guest lodging services to the public under the Knights® name and certain services to its franchisees, including a centralized reservation system, advertising, publicity, and training services.

12.    KFS or its predecessors first used the KNIGHTS INN mark in 1974 and the Knights® Marks are in full force and effect.  Certain of the registered Knights® Marks are incontestable pursuant to 15 U.S.C. § 1065.

13.     KFS has given notice to the public of the registration of the Knights® Marks as provided in 15 U.S.C. § 1111.

14.     KFS uses or has used the words "Knights," and "Knights Inn," among others, as abbreviations of its brand name.

15.     Through its franchise system, KFS markets, promotes, and provides services to its guest lodging franchisees throughout the United States.  In order to identify the origin of their guest lodging services, KFS allows its franchisees to utilize the Knights® Marks and to promote the Knights® brand name.

16.     KFS has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Knights® Marks as distinctly designating KFS guest lodging services as originating with KFS.

17.     The value of the goodwill developed in the Knights® Marks does not admit of precise monetary calculation, but because KFS is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of KFS's goodwill exceeds hundreds of millions of dollars.

18.     The Knights® Marks are indisputably among the most famous in the United States.

## The Agreements Between The Parties

19.     On or about July 3, 1998, KFS entered into the Franchise Agreement with Laxmi Krupa for the operation of a 48[1]-room Knights® guest lodging facility located at 601 West Central Avenue, Lenox, Georgia 31637, designated as Knights® Site No. 10608-85840-02 (the "Facility").  A true copy of the Franchise Agreement is attached hereto as Exhibit A.

20.     Pursuant to section 5 of the Franchise Agreement, Laxmi Krupa was obligated to operate a Knights® guest lodging facility for a fifteen-year term during which time Laxmi Krupa was permitted to use the Knights® Marks in association with the operation and use of the Facility as part of KFS's franchise system.

21.     Pursuant to section 4.8 of the Franchise Agreement, KFS had the right to conduct unlimited quality assurance inspections of the Facility (and unlimited reinspections if the Facility received a failing score in the inspection) to determine whether the Facility was in compliance with KFS's quality assurance requirements.

22.     Pursuant to section 7, section 18.4 and Schedule C of the Franchise Agreement, Laxmi Krupa was required to make certain periodic payments to KFS for royalties, taxes, interest, system assessment fees, and other fees (collectively, "Recurring Fees").

23.     Pursuant to section 7.3 of the Franchise Agreement, Laxmi Krupa agreed that interest is payable "on any past due amount payable to [KFS] under this [Franchise]

---

[1]   Pursuant to a letter dated September 9, 1999, KFS acknowledged a decrease in the number of approved guest rooms at the Facility from 48 to 47.  A true copy of the September 9, 1999 correspondence is attached hereto as Exhibit B

Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

24.     Pursuant to section 3.9 of the Franchise Agreement, Laxmi Krupa was required to disclose, among other things, the amount of gross room revenue earned by Laxmi Krupa at the Facility for purposes of establishing the amount of royalties and other Recurring Fees due to KFS.

25.     Pursuant to section 3.9 of the Franchise Agreement, Laxmi Krupa agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the Franchise Agreement, Laxmi Krupa agreed to allow KFS to examine, audit, and make copies of the entries in these books, records, and accounts.

26.     Section 13 of the Franchise Agreement specified Laxmi Krupa's obligations in the event of a termination of the Franchise Agreement, including its obligation to immediately cease using all of the Knights® Marks.

27.     Pursuant to section 17.4 of the Franchise Agreement, Laxmi Krupa agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

28.     Effective as of the date of the Franchise Agreement, Mehta and Ramesh Sheth provided KFS with a Guaranty of Laxmi Krupa's obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as Exhibit C.[2]

29.     Pursuant to the terms of the Guaranty, Mehta agreed, among other things, that upon a default under the Franchise Agreement, he would "immediately make each payment and perform or cause [Laxmi Krupa] to perform, each unpaid or unperformed obligation of [Laxmi Krupa] under the [Franchise] Agreement."

30.     Pursuant to the terms of the Guaranty, Mehta agreed to pay the costs, including reasonable attorneys' fees, incurred by KFS in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

## The Expiration of the Franchise Agreement

31.     Effective July 2, 2013, KFS acknowledged that the Franchise Agreement expired and advised Laxmi Krupa that it was required to pay KFS all outstanding Recurring Fees through the date of expiration.

32.     By letter dated July 12, 2013, a true copy of which is attached as Exhibit E, KFS reiterated the expiration of the Franchise Agreement, effective July 2, 2013, and advised Laxmi Krupa that (a) it was to immediately discontinue the use of all items bearing the Knights® Marks, (b) it had to de-identify the Facility within 10 days after the date of the letter, and (c) demand was made for all outstanding Recurring Fees through the date of expiration.

---

[2] By Amendment dated October 21, 2003 the parties amended the Guaranty to reflect Mehta as the sole guarantor of Laxmi Krupa's obligation under the Franchise Agreement.  A true copy of the October 21, 2003 Amendment is attached hereto as Exhibit D.

33.     The expiration of the Franchise Agreement precluded Laxmi Krupa from any further use of the Knights® Marks in or around the Facility.

34.     The expiration of the Franchise Agreement precluded Laxmi Krupa from any further use of the Knights® Marks to induce the traveling public to use the Facility in any way.

35.     Following the expiration of the Franchise Agreement, Laxmi Krupa used the Knights® Marks to induce the traveling public to rent guest rooms at the Facility.

36.     Following the expiration of the Franchise Agreement, Laxmi Krupa used the Knights® Marks without authorization to rent rooms through, among other things, failure to remove Knights® signage and continuing to identify the Facility as a Knights® guest lodging facility.

37.     On or about December 23, 2014, Laxmi Krupa removed the Knights® Marks from the Facility.

## **FIRST COUNT**

38.     KFS repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 37 of the Verified Complaint.

39.     Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on

or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

40.     Laxmi Krupa marketed, promoted, and rented, and continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Knights® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

41.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods and/or services . . . shall be liable in a civil action . . . ."

42.     The acts of Laxmi Krupa in marketing, promoting, and renting rooms at the Facility, through and with the Knights® Marks, constitute:

>    (a)     a false designation of origin;

>    (b)     a false and misleading description of fact; and

>    (c)     a false and misleading representation of fact;

that caused and are likely to continue to cause confusion, or to cause mistake, or deception, as to the affiliation of Laxmi Krupa's Facility with KFS, and to cause confusion, or to cause mistake, or

deception, to the effect that KFS sponsors or approves of the guest lodging services that Laxmi Krupa provides at the Facility, all in violation of Section 43(a) of the Lanham Act.

43.     Laxmi Krupa's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

44.     Laxmi Krupa's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted and continue to inflict irreparable harm on KFS.

45.     KFS has no adequate remedy at law.

46.     No previous injunctive relief has been awarded with respect to this matter in this case or any other case.

**WHEREFORE**, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), KFS demands judgment against Laxmi Krupa:

(a)     Granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## SECOND COUNT

47.     KFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 46 of the Verified Complaint.

48.     Pursuant to sections 3.8 and 4.8 of the Franchise Agreement, Laxmi Krupa agreed to allow KFS to examine, audit, and make copies of Laxmi Krupa's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

49.     Laxmi Krupa has engaged in acts and practices, as described, which amount to infringement of the Knights® Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

50.     As a result, Laxmi Krupa owes restitution and the disgorgement of profits, in an amount unknown to KFS, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Laxmi Krupa.

**WHEREFORE**, KFS demands judgment ordering that Laxmi Krupa account to KFS for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Knights® Marks.

## THIRD COUNT

51.     KFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 50 of the Verified Complaint.

52.     Pursuant to section 7, section 18.4 and Schedule C of the Franchise Agreement, Laxmi Krupa was obligated to remit Recurring Fees to KFS.

- 11 -

53.     Despite its obligation to do so, Laxmi Krupa failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement in the current amount of $104,588.07.

54.     Laxmi Krupa's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged KFS.

**WHEREFORE**, KFS demands judgment against Laxmi Krupa for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $104,588.07, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

55.     KFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 54 of the Verified Complaint.

56.     At the time of the termination of the Franchise Agreement, Laxmi Krupa was obligated to pay KFS Recurring Fees.

57.     Despite its obligation to do so, Laxmi Krupa failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement in the current amount of $104,588.07.

58.     In addition, Laxmi Krupa benefited from its wrongful use of the Knights® Marks after termination of the Franchise Agreement and paid no royalty or other Recurring Fees to KFS in return for that benefit.

59.     Laxmi Krupa's failure to compensate KFS constitutes unjust enrichment and has damaged KFS.

**WHEREFORE**, KFS demands judgment against Laxmi Krupa for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $104,588.07, and all royalties and other Recurring Fees that should be paid to compensate KFS for the period during which Laxmi Krupa misused the Knights® Marks and was thereby unjustly enriched, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

60.     KFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 59 of the Verified Complaint.

61.     Pursuant to the terms of the Guaranty, Mehta agreed, among other things, that upon a default under the Franchise Agreement, they would immediately make each payment and perform each obligation required of Laxmi Krupa under the Franchise Agreement.

62.     Despite his obligation to do so, Mehta has failed to make any payments or perform or cause Laxmi Krupa to perform each obligation required under the Franchise Agreement.

63.     Pursuant to the Guaranty, Mehta is liable to KFS for Laxmi Krupa's Recurring Fees due and owing under the Franchise Agreement, in the current amount of $104,588.07, and for those additional Recurring Fees attributable to the period during which Laxmi Krupa has misused the Knights® Marks.

**WHEREFORE**, KFS demands judgment against Mehta for damages in the amount of:

(a)    All Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit; and

(b)    All profits, royalties, and other Recurring Fees that should be paid to compensate KFS for the period during which Laxmi Krupa misused the Knights® Marks and was thereby unjustly enriched, together with interest, attorneys' fees, and costs of suit.

**LeClairRyan**
Attorneys for Plaintiff,
Knights Franchise Systems, Inc.

By: _____
        **BRYAN P. COUCH**

Dated: 12/22/15

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**LeClairRyan**
Attorneys for Plaintiff,
Knights Franchise Systems, Inc.

By: _____

**BRYAN P. COUCH**

Dated: 12/22/15

## **VERIFICATION**

STATE OF NEW JERSEY    )
                         ) ss:
COUNTY OF MORRIS    )

        Suzanne Fenimore, of full age, being duly sworn according to law, upon her oath, deposes and says:

        I am Senior Director of Contracts Compliance for Knights Franchise Systems, Inc., which is plaintiff in this action.

        I have read the foregoing Verified Complaint and all the allegations contained therein.  Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Verified Complaint are true based on my personal knowledge, the records of KFS and/or information available through employees of KFS.

 

                                                  _____
                                                    SUZANNE FENIMORE

Sworn and subscribed to before me this
22ND day of DECEMBER , 2015

_____
          NOTARY PUBLIC

**CINDY J. O'CONNOR**
Notary Public
State of New Jersey
My Commission Expires Feb. 13, 2020

- 16 -

# EXHIBIT A

1134098v1

Location: Lenox, Georgia
Entity No. 85840
Unit No.: 10608

## KNIGHTS INN
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated July 3 , 1998, is between KNIGHTS FRANCHISE SYSTEMS, INC., a Delaware corporation ("we", "our" or "us"), and Laxmi Krupa, Inc., a Georgia corporation ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

This transaction involves the transfer of an existing Chain Facility at the Location first granted to Lenox Motel, a Georgia corporation ("Prior Franchisee") in a Franchise Agreement with us dated October 7, 1997 (the "Prior Agreement"). **[Second Paragraph Deleted]** ~~You assume and obligate itself to perform any and all of the obligations (financial and otherwise) of the Prior Franchisee under the Prior Agreement that is not paid or performed as of the date of this Agreement, including without limitation, the obligations to pay any unpaid Royalties, System Assessment Fees, other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement.~~

**1.  License.** We have the exclusive right to license and franchise to you the distinctive "Knights" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The License is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Knights Inn." You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion.

**2.  Protected Territory.** We will not own, operate, lease, manage, or license anyone but you to operate a Chain Facility in the "Protected Territory", defined in Appendix A from the Effective Date until the earliest to occur of the Term's expiration, a Transfer or a Termination. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminates or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that there are no express or implied territorial rights or agreements between the parties except as stated in this Section.

KNIEXHCI 2/98

1



Section.

**3.   Your Improvement and Operating Obligations.**   Your obligations to improve, operate and maintain the Facility are:

**3.1   Improvements.**   You will select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards.   You must improve the Facility as if it is an existing Facility converting to enter the Knights Inn Chain.   You must begin improvement of the Facility no later than thirty (30) days after the Effective Date according to the Punch List we prepare and attach to this Agreement as Schedule B.   The Facility must score 350 points (or equivalent if the scoring system changes) and the first phase of improvement must be completed no later than ninety (90) days after the Effective Date.   The Facility must score 370 points (or equivalent) and complete the Punch List within 9 months after the Effective Date.   All improvements will comply with System Standards, the Approved Plans and any Punch List attached to this Agreement.   Your general contractor or you must carry the insurance required under this Agreement during renovation.   If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3, or the Facility does not meet the post-transfer quality assurance inspection standard, or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation.   The grant of an extension will not waive any other default existing at the time the extension is granted.

**3.2   Improvement Plans.**   You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location.   We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like.   Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements.   We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction.   Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

**3.3   Pre-Opening.**   You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual.   If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Sections 3.1 and 11.2, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark.   We may delay the Opening Date until you pay the Royalty accruing under this Section.

3.4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay.

3.5 **Training.** The Facility's general manager will attend the training programs described in Section 4.1 we designate as mandatory. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6 **Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1 You may participate in any regional marketing, training or management alliance or cooperative of Chain franchisees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.7 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.

3.8 *Inspections and Audits.* You will permit our representatives to perform quality assurance inspections of the Facility and audit your financial and operating books and records (including tax

returns) particularly those relating to the Facility and any related business, with or without prior notice of the inspection or audit. The inspections and audits will commence during normal business hours, although we may observe Facility operation and accounting activity at any time. You, the Facility staff and your other agents and employees will cooperate with our inspectors and auditors in the performance of their duties. We may access via telephone datalink any data or reports you maintain on the Facility's property management system (if any) as part of the audit process, but we will not interfere with the operation of that system while we are in electronic communication with it. You will pay us any underpayment of, and we will pay you or credit your Recurring Fee account for any overpayment of, Recurring Fees discovered by an audit. If the Facility does not pass an inspection, you refuse to cooperate with our inspectors or our auditors when they arrive for an audit at a time scheduled at least 3 business days in advance or the audit reveals that you paid us less than 97% of the correct amount of Recurring Fees for a fiscal year or longer, you will pay us the Audit Fee described in Section 4.8, or the reasonable costs of travel, lodging and meal expenses for reinspection and any reinspection fee we may impose. We may publish or disclose the results of quality assurance inspections.

3.9 **Reports and Accounting.** You will prepare and submit timely Monthly Reports containing the information we require about the Facility's performance during the preceding month. You will prepare and submit other reports and information about the Facility as we may reasonably request from time to time or in the System Standards Manual. You will prepare and maintain any reports required under the System Standards Manual in the Facility's property management or reservation computer system, including the name and address of Facility guests, if collected, and send them to us or allow us to access them by means of a telephone datalink. You will allow us access to the reports and data stored on the Facility's property management or reservation computer system via telephone, provided that we will not unreasonably interfere with normal functioning of the property management or reservation computer system. You will allow us access to any reports and data stored on the Facility's property management system (if any) via telephone, provided that we will not unreasonably interfere with normal functioning of the property management system while we are in electronic communication. You will maintain accounting books and records in accordance with generally accepted accounting principles and the American Hotel & Motel Association Uniform System of Accounts for Hotels, as amended, subject to this Agreement and other reasonable accounting standards we may specify from time to time. You will prepare and submit to us if we so request your annual and semi-annual financial statements. We do not require that your financial statements be independently audited, but you will send us a copy of your audited statements if you have them audited and we ask for them.

3.10 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Knights Franchise Systems, Inc. and Cendant Corporation, its successors and assigns as additional insureds.

3.11 **Conferences.** You (or your representative with executive authority if you are an entity) will attend each Chain conference and pay the Conference Fee we set for the Chain franchisees, if and

when we determine to hold a Chain conference.  Mandatory recurrent training for franchisees and managers described in Section 4.1.3 (if any) may be held at a conference.  The fee will be the same for all Chain Facilities that we license in the United States.  You will receive reasonable notice of a Chain conference.

3.12  **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve.  You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Knights Inn" and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System.  You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.  You will follow System Standards for identification of the Facility and to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14  **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each guest room you add once the Facility has 100 rooms.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which  we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15  **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time, (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16  **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.  You will perform the Minor Renovations as and when the Minor Renovation Notice requires.  We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged at least 370 points or equivalent and the most recent quality assurance inspection score for the Facility was at least 350 points or equivalent when the Facility is otherwise eligible for a Minor Renovation.

**4.  Our Operating and Service Obligations.**  We will provide you with the following services

and assistance:

4.1 **Training.** We will offer hospitality management training, property opening, recurrent training and supplemental training.

4.1.1 **Management Training.** We will offer at a location in the United States we designate, and the Facility general manager must complete within the time period specified in the System Standards Manual, a management training program. You may also participate in this program. The training program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. We charge you a fee under Section 7.5 for this training; we may also charge a reasonable fee for materials for each manager trainee. You must pay for your trainee's travel, lodging, meals, incidental expenses, compensation and benefits during this training.

4.1.2 **Property Opening Training.** We will provide at the Facility or another agreed location, and your staff must attend, a property opening training program (at our discretion as to length and scheduling) to assist you in opening the Facility. We may charge you a fee under Section 7.5 for this training. You will pay the cost of any site used if the Facility is not available.

4.1.3 **Recurrent Training.** We will provide training for you or the Facility's manager if we determine that additional training for franchisees or managers is necessary from time to time. Training will be held in our U.S. training center or other locations. You will pay for your trainee's travel, lodging, meals, incidental expenses, compensation and benefits for this training. We may assess you a reasonable charge for instructional materials and reasonable tuition for training at mandatory sessions. This training may be held in conjunction with a Chain conference.

4.1.4 **Supplemental Training.** We may offer optional training programs without charge or for reasonable tuition. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices.

4.2 **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the System Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if your Recurring Fee payments are up to date. The Facility will participate in the Reservation System, commencing with the Opening Date, for the balance of the Term, unless and until a Termination occurs. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number the opportunity to make reservations for other lodging chains in the United States, provided that we may transfer callers who desire reservations in cities where the Chain has no Chain Facilities to other lodging chains affiliated with Cendant Corporation.

4.3  **Marketing.**

4.3.1  We will use the System Assessment Fees, in our sole discretion, to promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research and other marketing programs, training programs, and related activities, production and distribution of Chain publications and directories of hotels.  We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs.  We or an affiliate may be reimbursed for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services.  We are not obligated to supplement or advance funds available from System Assessment Fees to pay for marketing activities.  We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2  We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3  We will publish the Chain Directory.  We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication.  We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements.  We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4  **Purchasing.**  We may offer optional assistance to you with purchasing items used at or in the Facility.  Our affiliates may offer this service on our behalf.  We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts.  We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5  **The System.**  We will control and establish requirements for all aspects of the System.  We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions.  We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6  **Consultations and Standards Compliance.**  We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct.  We will provide telephone and mail consultation on Facility operation and marketing through our representatives.  We may, in our sole discretion offer to provide, and you may, at your option, obtain the services of our architects and interior designers.  You must pay the fees and expenses described in Section 7.5 for these services.

KNEXHC1 2/98

4.7 **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain franchisees and all separate policy statements in effect from time to time.

4.8 **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We may access the reports and data stored in the Facility's property management system (if any) provided that we do not unreasonably interfere with the normal functioning of the property management system. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.8. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

5. **Term.** The Term begins on the Effective Date and expires on the day prior to the fifteenth anniversary of the Opening Date, unless and until a Termination occurs. Some of your duties and obligations will survive termination or expiration of the License and this Agreement. You will execute and deliver to us with this Agreement a notarized Declaration of Franchise Agreement in recordable form. We will countersign and return one copy of the Declaration to you. We may, at our option, record the Declaration in the real property records of the county where the Facility is located. The Declaration will be released at your request and expense when this Agreement terminates or expires and you perform your post-termination obligations. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6. **Initial Fees.** We have received from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of $5,000.00 when you sign this Agreement, which is fully earned when we sign this Agreement.

7. **Additional Fees, Taxes and Interest.**

7.1     You will pay us certain fees each month payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) ten days after the month in which they accrue, without billing or demand. These fees include the following:

7.1.1   A "Royalty" equal to four and five-tenths percent (4.5%) of the accrued Gross Room Revenues of the Facility to compensate us for granting you the License and the opportunity to use the System, accrues from the earlier of the Opening Date or the date you operate the Facility under a Mark without our consent, until the end of the Term.

7.1.2  A "System Assessment Fee" as stated in Schedule C for advertising, public relations, marketing, training, reservation and other related services and programs accrues from the earlier of the Opening Date or the date you operate the Facility under a Mark without our consent, until the end of the Term, including during suspension periods.  After consultation with the Association, and upon 60 days written notice, we may change the System Assessment Fee for all Chain Facilities to cover costs (including reasonable direct and indirect overhead costs) related to such services and programs or to cover the cost of additional services or programs.  At our option you will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks.  We may charge a reasonable service fee for this service.  We may increase or adjust the System Assessment Fee, travel agent commissions, service charges, and other fees in the future on not less than 60 days prior written notice, provided that you will not be required to pay more than 5% of Gross Room Revenues for the System Assessment Fee.  We may charge Chain Facilities using the System outside the United States for reservation service using a different formula.

7.2  You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State.  You will pay Taxes to us when due.

7.3  "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4  If a Transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

7.5  Supplemental fees are payable for certain additional services you elect for us to provide to you or the Facility.

7.5.1  You will pay us a $500.00 Management Training Fee (per manager trainee) for the first time you participate in the Management Training Program.  We may change this fee in the future and we may charge you a reasonable training fee for additional and replacement manager trainees.  These fees are payable to us 30 days before each Program that you purchase is scheduled to begin.

7.5.2  You will pay us a $500.00 Property Training Fee at least 30 days before our trainers are scheduled to begin our Property Training Program at the Facility.

7.5.3  You will pay us on a time and materials basis for the services of our architects and interior design personnel that you request to assist you.  The rate for these services as of the Effective Date is $50.00 per hour.  We may change this rate without notice to you, but we will notify you about any different rate that we will charge before you incur any fees for any requested services. Payments for these services will be due when invoiced.

KNIEXHC1 2/98

9

7.5.4  You must pay the reasonable travel, lodging and meal expenses of our Property Training Program trainers, designers and architects in addition to the fees described above. You (or your representative) may not attend the Management Training Program, and we will not perform Property Training Program or design services if you do not pay the fees and charges under this Section 7.5 when due. Tuition and fees paid under Section 4.1 and this Section 7.5 will not be refundable.

## 8.  **Indemnifications**.

8.1  Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee directly engaged in willful misconduct or intentionally caused the property damage or bodily injury that is the subject of the claim  In that case, you will be reimbursed for the expenses you incur to indemnify the Indemnitee. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2  You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3  We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9.  Your Assignments, Transfers and Conveyances.

9.1  **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity).  We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you.  You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent.  If a Transfer is to occur, the transferee or you must comply with Section 9.3 and 9.6.  your License is subject to termination when the Transfer occurs.  The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility.  The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13.  You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise.  Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2  **Public Offerings and Registered Securities.**  You may engage the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $25,000.  Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3  **Conditions.**  We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions.  If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as described below.  We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise.  We will require renovation of the Facility to meet our entry standards for conversion of existing facilities into Chain Facilities effective when the Transfer occurs.  Our consent to the transaction will not be effective until these conditions are satisfied.

9.4  **Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee.  No Transfer will be deemed to occur.  You also must not be in

default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5  **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6  **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10.  Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11.  Default and Termination.**

11.1  **Default.** You will be in default under this Agreement if (a) you do not pay us when a payment is due, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate the License or this Agreement if the Opening Date has not occurred by written notice to you. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection, you may cure the default within 90 days after the failing inspection. We may terminate the License if you do not perform that improvement agreement.

11.2 **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1, (2) you discontinue operating the Facility as a "Knights Inn", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive **three (3)** or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests, or (14) you do not satisfy the Improvement Obligation when required under Section 3.1 and we are authorized to terminate this Agreement.

## 11.3 **Casualty and Condemnation.**

11.3.1   You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate the License, or this Agreement if the Opening Date has not occurred, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If such a termination occurs, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2   You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.



11.3.3  The exclusive territory covenant in Section 2 terminates when you give us notice or you are deemed to give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4  **Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement, discontinue  Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving you notice of your non-performance, non-payment or default.  All System Assessment Fees accrue during the suspension period.  Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform.  We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards.  We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory.  You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief.  We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice.  Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5  **Your Remedies.**  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent.  To the extent permitted by applicable law, this action shall be your exclusive remedy.  We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12.  Liquidated Damages.

12.1  **Generally.**  If we terminate the License under Section 11.2, or you terminate the License or this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Recurring Fees during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term at the date of termination, whichever is less).  If the Facility has been open for less than 24 months, then the amount shall be the average monthly Recurring Fees since the Opening Date multiplied by 24.  You will also pay any applicable Taxes assessed on such payment.  Liquidated Damages will not be less than the product of $1,000.00 multiplied by the number of guest rooms in the Facility.  If we terminate this Agreement under Sections 3 and 11.2 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to $500.00 per guest room.  Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement.  Our right to receive other amounts due under this Agreement is not affected.

KNIEXHC1 2/98

14

12.2 **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us Recurring Fees for a period of one year after we receive the initial notice of condemnation described in Section 11.3, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Recurring Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but you must pay Recurring Fees when due until Condemnation is completed.

**13. <u>Your Duties At and After Termination</u>.** When the License or this Agreement terminates for any reason whatsoever:

13.1 **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Knights Inn", including the System Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3 **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4 **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.9 (as to information relating to the Term, for 2 years after termination), 3.13, 7 (as to amounts

accruing through termination), 8, 13, 15, and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14.** **Your Representations and Warranties.**  You expressly represent and warrant to us as follows:

14.1   **Quiet Enjoyment and Financing.**   You own, or will own prior to commencing improvement, or lease, the Location and the Facility.  You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility.  You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2   **This Transaction.**  You have received, at least 10 business days prior to execution of this Agreement and making any payment to us, our current Uniform Franchise Offering Circular for prospective franchisees.  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you that is not written in this Agreement on which you are relying to enter into this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement.  You have obtained all necessary approvals of your owners, Board of Directors and lenders.  Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject.  Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application.  You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.

14.3   **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances.  There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

### 15. Proprietary Rights.

15.1 **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2 **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3 **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or franchisee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location other than within the Protected Territory. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4 **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

KNIEXHC1 2/98

17

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

## 16.  Relationship of Parties.

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17.  Legal Matters.

17.1 **Partial Invalidity.** If any part of this Agreement, for any reason, is declared invalid or unenforceable, the remainder shall not be effected. However, if in our judgment such decision substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective.

17.3 **Notices.** Notices will be effective if in writing and delivered by facsimile transmission with confirmation original sent by first class mail, postage prepaid, by delivery service, with proof of delivery, or by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party at its address stated below or as may be otherwise designated by notice. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

KNIEXHCI 2/98

18 ℞

**Laxmi Krupa, Inc.:**
Your address:  2214 Congress Park, Athens, TN 37303,
                          Attention: Ramesh Sheth
Fax No.:        (423) 745-8122


**Knights Franchise Systems, Inc.:**
Our address:   6 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278,
                          Attention: Vice President-Franchise Administration
Fax No.         (973) 496-5359

**17.4  Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement. You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies between you and us or under this Agreement.

**17.5  Miscellaneous.** This Agreement will be governed by and construed under the laws of the State of New Jersey. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey. This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only. We may unilaterally revise Schedule C under this Agreement. This Agreement, together with the exhibits and schedules attached, is the entire agreement (superseding all prior representations, agreements and understandings, oral or written) of the parties about the Facility.

**17.6  Waiver of Jury Trial. The parties waive the right to a jury trial in any action related to this Agreement or the relationship between the franchisor, the franchisee, any guarantor, and their respective successors and assigns.**

KNIEXHC1 2/98

**18.** **Special Stipulations.** The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1 **Right of First Refusal.** During the term of this Agreement beginning on the Effective Date, you have a right of first refusal on applications for System licenses within the area described on the attached Schedule "D" (the "Right of First Refusal Area"). We will notify you when we receive an application for a proposed Chain Facility within the Right of First Refusal Area. You will then have a period of thirty (30) days from the date you receive our notice to submit a completed license application and the then current Application Fee for a proposed alternative Chain Facility having at least 80% of the guest rooms as the proposed Facility of the applicant located within the Right of First Refusal Area. We will conditionally accept your application if we determine that your application is a reasonably acceptable alternative to the applicant's, and your application is otherwise in order. If (i) you don't submit a complete application and Application Fee on time, (ii) your proposed Chain Facility is not reasonably acceptable to us, (iii) you don't sign our then current form of license agreement and related agreements and pay the then current Initial Fee within 15 days after we deliver the agreements to you, or (iv) you are in default under this Agreement or any other agreement with us at the time we must give notice of an application in the Right of First Refusal Area, then we will be free to enter into a license agreement with the other applicant. This Section automatically terminates without notice if and as of the date (i) a Termination occurs, (ii) we send you a notice of default, and you fail to cure the default within the time permitted, if any, in the notice, (iii) after you complete the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 275 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of 275 or less in a reinspection to be performed at least 30 days after the initial inspection, or (iv) you fail to sign the license agreement and pay the Initial Fee as provided above after you submit an application we approve in response to a competing application. During the time this Section is in effect, you and each owner of at least 25% of your Equity Interests will not own, operate, lease, manage, or finance a hotel, motel or transient lodging facility other than a Chain Facility or a facility licensed by an affiliate of Ours within the Right of First Refusal Area.

18.2 **Your Additional Termination Right.** You may terminate the License without cause or penalty effective only on the **third and tenth** anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you comply with the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 275 (or its then equivalent) on a quality assurance inspection and then fails to achieve a score of 275 or less (or its then equivalent) in a reinspection to be performed no sooner than 30 days after the initial inspection.

18.3 **Our Additional Termination Right.**  We may terminate the License without cause or penalty effective only on the **third and tenth** anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination.  You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.

18.4 **Special Royalty.**  Notwithstanding Section 7.1, the Royalty rate on Gross Room Revenues accruing during the following periods will be as follows:

18.4.1  The Royalty shall be **two and one half** percent (2.5%) of Gross Room Revenues for the first License Year; and

18.4.2  The Royalty shall be **three and one half** percent (3.5%) of Gross Room Revenues for the second License Year; and

18.4.3  The Royalty shall revert to the rate specified in Section 7.1 of **four and one half** percent (4.5%) on the third Anniversary of the Effective Date; and

18.4.4  The Royalty shall be **three and one half** percent (3.5%) of Gross Room Revenues for the fourth and fifth License Year; and

18.4.5  The Royalty shall change to the rate specified in Section 7.1 after the fifth License Year; and

18.4.6  The Royalty rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty shall reset to the rate specified in Section 7.1, if and as of the date (i) a Termination occurs, (ii) we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default or, (iii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of less than 275 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of at least 275 in a reinspection to be performed not less than 30 days after the initial inspection.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
**KNIGHTS FRANCHISE SYSTEMS, INC.**

By: _____                    Attest: _____
C. Wayne Miller                                            Assistant Secretary
Vice President
Franchise Administration


**YOU, as Franchisee:**
LAXMI KRUPA, INC.

By: _____                    Attest: _Jannet Andersson_
Ramesh Sheth
President

KNIEXHC1 2/98

22

## APPENDIX A

DEFINITIONS

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Declaration means the Declaration of Franchise Agreement you and we sign under Section 5.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

KNIEXHC1 2/98

23 PS

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Chain Facilities located outside the United States, Canada and Mexico.

Effective Date means the date that you first take possession of the Facility.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties constructed at the Location, as modified with our consent.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means the one year period beginning on the Opening Date and each subsequent anniversary of the Opening Date and ending on the day preceding the next anniversary of the Opening Date.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 601 W. Central Avenue, Lenox, GA 31637, as more fully described in Schedule A.

Losses and Expenses means all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Knights Inn" and other marks; and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

KNIEXHC1 2/98

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Minor Renovation Ceiling Amount means $1,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee  or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades, updates, improvements, repairs, repainting, refurbishing and replacements we prepare and require for an existing facility to convert to a Chain Facility or as part of the Transfer process.

Protected Territory means from the facility along I-75 in a southerly direction up to and including exit 10 in a northrly direction up to but not including exit 18 with a 1/2 mile on each side of the centerline of I-75. Licensee will be give a 1st right of refusal for exit 18.

Recurring Fees means the Royalties and System Assessment Fees as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.
Royalty means the monthly fee you pay to us for use of the System under Section 7.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify, which at present includes only the following:  (a) the Marks; (b) other intellectual property, including  Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fee means the fee charged under Section 7.1.2 and Schedule C to pay for the cost of the System's marketing, advertising, public relations, Reservation System, training and other services.

System Standards means the standards for participating in the Chain and using the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

KNIEXHC1 2/98

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility.  A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Knights Franchise Systems, Inc., its successors and assigns.

## SCHEDULE A

(Legal Description of Facility)

KNIEXHC1  2/08

## SCHEDULE B

### PART I:  YOUR OWNERS

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|------------------------|
| Ramesh Sheth | 60% | common stock |
| Bhanu Mehta | 40% | common stock |

### PART II:  THE KNIGHTS INN FACILITY:

Number of approved guest rooms: 48

Parking facilities (number of spaces, description): 48

Other Amenities, services and facilities:

### PART III:    DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE COMPLETED AS THE IMPROVEMENT OBLIGATION:

### {PUNCHLIST ATTACHED}

KNIEXHC1 2/98

30





**Knights Inn**

## FRANCHISOR: KNIGHTS FRANCHISE SYSTEM, INC.

### "SCHEDULE B"
### PUNCHLIST FOR CHANGE OF OWNERSHIP
### June 15, 1998
### (Revised September 17, 1998)

| *FACILITY* | *TIER* | *GUEST ROOMS* |
|---|---|---|
| Lenox Inn Motel (Knights Inn #10608) | Inn | 48 |
| 601 West Central Avenue | | |
| Lenox, GA 31637 | | |

*OWNER/APPLICANT*
**Bhanu Mehta**
**Ramesh Sheth**

*FRANCHISE*
*ADMINISTRATION*
Jeff Kayhart
(973) 496-5357

*Q.A. REPRESENTATIVE*
Sara Jabs

### PROPERTY CONDITION SUMMARY

This 29-year-old property, located at Interstate 75 Exit #13, consists of two rectangular, two story, exterior corridor, single loaded, concrete block and stucco guestroom buildings. A commercial building housing the lobby, the indoor pool and two employee apartments is on the West side of the property and is of similar construction. Minor exterior work along with major cosmetic upgrading in the guestrooms will be required. The existing landscaping must be improved to enhance curb appeal.

|  | **EXISTING** |
|---|---|
| Lobby Dimensions: | 374 SF |
| Guest Room Dimensions: | 201 SF (24 rooms); 264 SF (24 rooms) |

### COMPLETION TIME

**All items listed in this punchlist must be completed within 9 months of the new license agreement unless otherwise noted.**



2

Knight's Inn #10608
Lenox, Georgia

## *PROPERTY EXTERIOR*

1. **Reduce corrosion on walkway in front of pool area and paint walkways and areas where corrosion was removed.**

2. Repair cracks in parking lot.

3. Upgrade property landscaping to enhance curb appeal by installing additional flowers and ground cover to existing landscaping beds. Additional landscape beds should be installed concentrating on the entrance, around staircase areas, courtyard and swimming pool areas. Strongly recommend using a professional landscaping firm. For additional assistance contact the Design and Development department of Knights Inn at (973) 496-2525.

## *PUBLIC AREAS*

1. Upgrade Lobby/Front Desk Area to include the following: **Lobby size is acceptable.**
   a. Install reservation/courtesy telephone per Company standards.
   b. Cover exposed fluorescent lighting with decorative covers (include public restroom lighting).

2. The owner is responsible to provide facilities to assist the handicapped in accordance with Local, State and Federal codes, regulations and ordinances.

3. Knights Inns requires sanitary dispensing type ice machines. At time of bin machine replacement, replace with a sanitary dispensing machine.

4. Renovate swimming pool area to include the following:
   a. Provide additional matching pool furniture to ensure a minimum of 2 tables, 8 chairs and 2 chaise lounges.
   b. Install "FT" markings on both vertical and horizontal surfaces.

3

Knight's Inn #10608
Lenox, Georgia

## GUEST ROOMS/BATHS

1.  Install a hotel function cylindrical knob lock and 1" throw separate keyed deadbolt (keyed for emergency access only) per Company standards and providing it meets state and local codes.

2.  Renovate connecting doors to include the following:
    a.  Provide a one way, doorknob latchset and a separate, non-keyed, 1" deadbolt lock on all connecting room doors. Operating knobs must be located on room side only with flush plates between doors. The existing key access deadbolt is unapproved.
    b.  Replace hollow core doors with solid wood doors. Ensure that all doors are painted white or a light, neutral color.

3.  Renovate guestrooms to include the following: **Rooms are sub-standard in size but will be acceptable.**
    a.  Cover concrete block walls with drywall and apply vinyl wall covering or an approved textured finish. Vinyl wainscot/smooth painted combination matching the existing outer bathroom walls is an acceptable option.
    b.  At time of carpet replacement, ensure that VCT entryways are covered with carpet. An acceptable option would be to install non-skid ceramic tile (minimum 4" - 6") in these areas. The existing VCT flooring will be acceptable in the interim.
    c.  Replace at least one of the existing armless occasional chairs. Two matching chairs (one armed) per room are required. Chairs must be fabric covered.
    d.  Replace light package. Two lamps per headboard wall, one credenza lamp and one activity lamp (floor style) are required in all guestrooms. All wall-mounted lamps must have wire covers or molding, loose cords are not acceptable.
    e.  Replace draperies. New draperies must have blackout capabilities, be pleated to double fullness, provide for overlapping of panels and must be baton or mechanically operated. Ensure that the new draperies coordinate with the existing softgood package. A new blackout panel with rod will be acceptable.
    f.  Professionally clean bath floor to eliminate discoloration.

4.  Provide a complete inventory of terry stock to comply with Company specifications.

4

Knight's Inn #10608
Lenox, Georgia

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND DO NOT BIND THE FRANCHISOR. ANY AND ALL REVISIONS TO THIS
PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY
ASSURANCE DEPARTMENT.

This Punchlist identifies items that require action due to meet the Franchisor's standards. The
Franchisor does not warrant that completion of the items on this Punchlist will cause the
converting facility to be in compliance with any applicable federal, state, local codes, ordinances
or regulations. You (and your architect, contractor and engineer, if applicable) are solely
responsible for conforming the Facility to the requirements of federal, state and local codes,
ordinances and regulations that may apply to your site.

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on
the date specified. The owner is responsible for meeting all Franchisor Standards. All repairs,
replacements and improvements must cause the item to meet or exceed the Franchisor's standards
published in the Standards of Operation and Design Manual.

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of the
facility changes materially or the License (Franchise) Agreement to which this is attached is
executed more than 90 days after the date of the Punchlist. Note that ordinary wear and tear,
particularly during busy seasons, may result in the need for additional work to meet entry
standards of the Franchisor.

This is not a License (Franchise) Agreement; the Company is not bound by this punchlist unless
and until the Company signs the License (Franchise) Agreement for the inspected facility.

**NOTE:** Any item on this Punchlist that is not required to be completed will continue to be
evaluated for appearance and condition during all Quality Assurance inspections conducted
before the date when completion is required.

This punchlist was revised on September 17, 1998. All previous copies are invalid.

1.      revised 8/4/1998  by: lv
2.      revised 9/17/98   by: lv

10608 CO K1



## SCHEDULE C

### February 1998

<u>System Assessment Fees and Other Fees</u>

The System Assessment Fee is three percent (3.00%) of Gross Room Revenues. The travel agent commission described in Section 7 is 10% of the Gross Room Revenues generated by each reservation originated by a travel agent, plus our service charge of .75% of commissionable revenue. The general sales agent commission (also known as international sales office commission) is 5% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office.

If you elect to participate in optional Internet reservation programs, you will be charged a fee per net reservation originated through the Internet, which is currently $2.50, that we may change in our discretion. We may charge additional fees for creating or modifying the Facility's Website, Webpage or performing other services.

We reserve the right to increase or modify the System Assessment Fee and any other fee and to add other fees and charges for new services, in our sole discretion as to amount or formula from time to time but with at least 60 days prior written notice, to reflect changes in the fully allocated costs of providing Reservation System services, to add, drop or modify the types of reservation services offered, and to provide the funds reasonably necessary or appropriate for the Chain's marketing, public relations and training programs.

## SCHEDULE D

## 1ST RIGHT OF REFUSAL

Franchisee will be given a first right of refusal for exit # 18 of I-75.

32 R S

# EXHIBIT B



**Knights Inn** ®



3178816 863

Ship #
Desc
Bill Ref            · Svce

2001 (10/98) W   SENDER'S COPY
Zip/Postal Code
Chg

September 9, 1999

**VIA AIRBORNE EXPRESS**

**Laxmi Krupa, Inc.**
c/o Knights Inn
601 W. Central Avenue
Lenox, Georgia 31637
Attention: Ramesh Sheth

Re:    Knights Inn Unit # 10608-85840 located in Lenox, Georgia ("Facility")

Dear Mr. Sheth:

We recently learned that the Facility is currently offering **47** guest rooms. This count is in opposition to the 48 guest rooms that our records indicate.

Please be advised that we will be updating our records to reflect the Facility's **47** guest rooms.  If this room count is incorrect for any reason, please contact Andrea Gumbs within 5 days of the date of this letter.  Ms. Gumbs can be reached at (973) 496-5342.

Thank you,

Louis A. Baumgartner
Senior Coordinator
Franchise Administration

Cc:    Andrea Gumbs
         Jean Burkhart

# EXHIBIT C

## GUARANTY

To induce Knights Franchise Systems, Inc. its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and the Development Advance Note, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Sections 17.4 (Remedies, Choice of Venue and Consent to Jurisdiction) and 17.6 (Waiver of Jury Trial), applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

Witnesses:                                      Guarantors:

_Jannet C. Andersson_

                                                RAMESH SHETH

                                                BHANO MEHTA

KNIEXHCI 2/98

33

# EXHIBIT D

## AMENDMENT TO FRANCHISE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this 21ˢᵗ day of __October__, 2003, by and between **KNIGHTS FRANCHISE SYSTEMS, INC.**, a Delaware corporation ("KFS") and **LAXMI KRUPA, INC.**, a Georgia corporation ("Franchisee"). This Amendment supplements that certain Franchise Agreement dated July 3, 1998, between the parties ("Franchise Agreement"), relating to a license to operate a Knights® System Unit located at 601 W. Central Avenue, Lenox, GA 31637, designated as Unit # 10608-85840-2 (the "Unit"). To the extent of any conflict between the Franchise Agreement and this Amendment, the Amendment shall control.

NOW, THEREFORE, in consideration of the premises, the mutual promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by each of the parties, the parties agree as follows:

1.    The Franchise Agreement is amended by revising Part 1 of Schedule B as follows:

SCHEDULE B

PART I:    YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|---|---|---|
| **Bhanuprasod Mehta** | **100%** | **common stock** |

2.    Bhanuprasod Mehta shall execute and deliver to KFS the Guaranty attached to this Amendment as "Exhibit A".

3.    Except as expressly stated in this Amendment, no further additions, modifications or deletions to the Agreement or Guaranty are intended by the parties or made by this Amendment.

**(SIGNATURE PAGE TO FOLLOW)**

IN WITNESS WHEREOF, the parties have executed this Amendment as of the day and year first above written:

**FRANCHISEE:**
**LAXMI KRUPA, INC.**

Attest: _____ By: _____

Name: BHANU MEHTA

Title: president


**DIW:**
**DAYS INNS WORLDWIDE, INC.**

Attest: _____ By: _____
(Assistant Secretary)

James D. Darby
Vice President
Franchise Administration

## EXHIBIT A

## GUARANTY

To induce Days Inns Worldwide, Inc., its successors and assigns ("you") to sign the Amendment to the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments,   will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement.  Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee.  We waive notice of amendment of the Agreement and notice of demand for payment or performance by Franchisee.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESS:                                GUARANTORS:

_____               _____
                                        Bhanuprasod Mehta

# EXHIBIT E



# WYNDHAM
## HOTEL GROUP

Contracts Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 • fax (800) 880-9445
www.wyndhamworldwide.com

July 12, 2013

**VIA OVERNIGHT COURIER**

Mr. Ramesh Sheth
Laxmi Krupa, Inc.
601 W. Central Avenue
Lenox, GA 31637
229-546-4223

Re:   **FINAL NOTICE OF EXPIRATION** of the Franchise for Knights Inn® System Unit
#10608-85840-02 located in Lenox, GA (the "Facility")

Dear Mr. Sheth:

Knights Franchise Systems, Inc. ("we" or "us") and Laxmi Krupa, Inc. ("you" or your") entered
into a Franchise Agreement, dated July 3, 1998 (the "Agreement") for the Facility.  The Agreement
expired on July 2, 2013 (the "Termination Date").  We would like to take this opportunity to thank
you for your business.

The Agreement requires you to perform certain post-termination obligations.  In addition to other
obligations specified in the Agreement, by no later than fourteen days after the Termination Date,
you must (a) remove all signage and other items bearing the Knights Inn Marks; (b) perform all
post-termination obligations specified in the Systems Standards Manual; (c) change all signs,
billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in
which the Facility is identified as a Knights Inn facility; and (d) remove the Knights Inn Marks from
any advertising or promotional activities on, around or directed towards the Facility, including any
web sites, web pages or search engines.  You must cooperate fully with us regarding any post-
termination inspections by us to verify that the Facility has been properly de-identified.  You must
immediately return to us all training documents, operating manuals and other proprietary material.
The de-identification procedures are specified in the attachment to this letter.

You are also responsible for payment of all fees under the Agreement through the date you
complete the de-identification process.  We estimate that, as of July 12, 2013, you owe us
$75,906.19 in Recurring Fees. We have enclosed an itemized statement a for your convenience.
You must also honor any advance reservations, including group reservations, made for the Facility
before the Termination Date at the rates and terms set when the reservations were made.  You must



Ramesh Sheth
Lenox, GA
Page 2

also timely pay all travel agent commissions. If you have any questions or need assistance with your
account balance information, please contact Megan McElroy, Settlement Coordinator, at (973) 753-7494.

If within the time period described above, you do not timely remove the exterior signage which
bears the Knights Inn trade name, trademarks and service marks we may exercise our rights under
the Agreement and send an independent contractor to the Facility to remove all such signage at and
around the Facility.  The cost of sign removal will be added to your final invoice from us.  If you
object to the removal of the signage by our independent contractor, you must notify us within 14
days of the date of this letter.  Otherwise, we will confirm the date and time that our contractor will
remove the signage from the Facility in a separate letter to you.

This letter is written without waiver of our rights, all of which are expressly reserved.  If you have any
questions or need assistance with the de-identification of the Facility, please contact Megan McElroy,
Settlement Coordinator, at (973) 753-7494.

Yours truly,

Jeanine Mahan
Director
Contracts Administration

Report Date : 12-JUL-13

ITEMIZED STATEMENT
-----------------

```
As of Date (DD-MMM-YYYY):  12-JUL-2013
Customer No             :  10608-85840-02-KNI
Category Set            :
Category Group          :
Group No                :
Bankruptcy              :  No Bankruptcy Sites
Disputed                :  No
Finance Charges Included:  Yes
```

Page 1 of 14

Report Date : 12-JUL-13

ITEMIZED STATEMENT
-----------------

```
Customer No :  10608-85840-02-KNI
Address :      33 Kinard Bridge,LENOX,GA,31637,US
As of Date:    12-JUL-2013
```

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| JAN-2010 | 23013899  | 22-JAN-10    | WYNREWARDS 5% |       | 3.82    | 0.00       | 1.37           | 5.19  |
|          | 1106981   | 29-JAN-10    | GDS & INTERNET |      | 17.40   | 0.00       | 6.09           | 23.49 |
|          | TA0106981 | 29-JAN-10    | T/A COMMISSIONS |     | 3.50    | 0.00       | 1.15           | 4.65  |
|          | 41277258  | 31-JAN-10    | Actual-1000A-RO |     | 365.14  | 0.00       | 213.12         | 578.26 |
|          | 30397270  | 31-JAN-10    | HSS SOFTWARE MA |     | 122.02  | 0.00       | 72.42          | 194.44 |
|          | 41278324  | 31-JAN-10    | Actual-1800A-RE |     | 121.71  | 0.00       | 71.14          | 192.85 |
|          | 41278753  | 31-JAN-10    | Actual-1210A-MA |     | 121.71  | 0.00       | 71.14          | 192.85 |
|          | 30404764  | 31-JAN-10    | HSS SOFTWARE MA |     | 122.02  | 0.00       | 72.42          | 194.44 |

ITEMIZED STATEMENT
--------------------

| Month | Account No | Date | Description | | | | |
|-------|-----------|------|-------------|-----|-----|-----|-----|
| | 41251946 | 31-JAN-10 | 5066A-DIRECWAY | 160.00 | 11.20 | 83.34 | 254.54 |
| | | | Sub Total | 1037.32 | 11.20 | 592.19 | 1640.71 |
| FEB-2010 | 41306087 | 28-FEB-10 | Actual-1800A-RE | 123.71 | 0.00 | 71.62 | 195.33 |
| | 30404763 | 28-FEB-10 | HSS SOFTWARE MA | 122.02 | 0.00 | 70.53 | 192.55 |
| | 41306027 | 28-FEB-10 | Actual-1210A-MA | 123.71 | 0.00 | 71.62 | 195.33 |
| | 41305180 | 28-FEB-10 | Actual-1000A-RO | 371.14 | 0.00 | 214.58 | 585.72 |
| | 41285170 | 28-FEB-10 | 5066A-DIRECWAY | 160.00 | 11.20 | 98.94 | 270.14 |
| | | | Sub Total | 900.58 | 11.20 | 527.29 | 1439.07 |
| MAR-2010 | 1113364 | 03-MAR-10 | GDS & INTERNET | 8.70 | 0.00 | 4.96 | 13.66 |
| | 30412408 | 12-MAR-10 | '10 GLOBAL CONF | 999.00 | 0.00 | 563.14 | 1562.14 |
| | 1119879 | 29-MAR-10 | GDS & INTERNET | 8.70 | 0.00 | 4.83 | 13.53 |
| | 41318105 | 31-MAR-10 | 5066A-DIRECWAY | 160.00 | 11.20 | 96.38 | 267.58 |
| | 41338110 | 31-MAR-10 | Actual-1210A-MA | 151.70 | 0.00 | 85.46 | 237.16 |
| | 41318036 | 31-MAR-10 | 5033A-HSS SOFTW | 122.02 | 0.00 | 68.70 | 190.72 |
| | 41337756 | 31-MAR-10 | Actual-1800A-RE | 151.70 | 0.00 | 85.46 | 237.16 |
| | 41337304 | 31-MAR-10 | Actual-1000A-RO | 455.10 | 0.00 | 256.28 | 711.38 |
| | | | Sub Total | 2056.92 | 11.20 | 1165.21 | 3233.33 |
| APR-2010 | 30222261 | 01-APR-10 | PRM TRAINING | 500.00 | 0.00 | 281.62 | 781.62 |
| | 30426821 | 14-APR-10 | ONLINE LRNG LIB | 50.00 | 0.00 | 28.27 | 78.27 |

Page 2 of 14

Report Date : 12-JUL-13

Customer No  :   10608-85840-02-KNI
Address :        33 Kinard Bridge,LENOX,GA, 31637, US
As of Date:      12-JUL-2013

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| | 41354937 | 30-APR-10 | 5066A-DIRECWAY | | 160.00 | 11.20 | 93.72 | 264.92 |
| | 41383442 | 30-APR-10 | Actual-1000A-RO | | 387.50 | 0.00 | 212.31 | 599.81 |
| | 41382559 | 30-APR-10 | Actual-1800A-RE | | 129.17 | 0.00 | 70.73 | 199.90 |
| | 41381981 | 30-APR-10 | Actual-1210A-MA | | 129.17 | 0.00 | 70.73 | 199.90 |
| | 41355293 | 30-APR-10 | 5033A-HSS SOFTW | | 122.02 | 0.00 | 66.81 | 188.83 |
| | | | Sub Total | | 1477.86 | 11.20 | 824.19 | 2313.25 |
| MAY-2010 | 10461442 | 13-MAY-10 | GUEST SATISFACT | | 46.95 | 0.00 | 25.73 | 72.68 |
| | 10461440 | 13-MAY-10 | GUEST SRVCS TRA | | 100.00 | 0.00 | 54.77 | 154.77 |
| | 41411474 | 31-MAY-10 | Actual-1000A-RO | | 323.37 | 0.00 | 172.23 | 495.60 |
| | 41410506 | 31-MAY-10 | Actual-1800A-RE | | 107.79 | 0.00 | 57.44 | 165.23 |
| | 41397299 | 31-MAY-10 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 49.80 | 143.25 |
| | 41410812 | 31-MAY-10 | Actual-1210A-MA | | 107.79 | 0.00 | 57.44 | 165.23 |
| | | | Sub Total | | 779.35 | 0.00 | 417.41 | 1196.76 |
| JUN-2010 | 10466676 | 03-JUN-10 | GUEST SRVCS TRA | | 100.00 | 0.00 | 53.27 | 153.27 |
| | 10466678 | 03-JUN-10 | GUEST SATISFACT | | 39.19 | 0.00 | 20.96 | 60.15 |
| | TA0139373 | 20-JUN-10 | T/A COMMISSIONS | | 10.50 | 0.00 | 5.41 | 15.91 |
| | 1139373 | 20-JUN-10 | GDS & INTERNET | | 30.70 | 0.00 | 15.96 | 46.66 |
| | 41425506 | 30-JUN-10 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 48.35 | 141.80 |
| | 41441428 | 30-JUN-10 | Actual-1800A-RE | | 137.99 | 0.00 | 72.21 | 210.20 |
| | 41441804 | 30-JUN-10 | Actual-1210A-MA | | 137.99 | 0.00 | 72.21 | 210.20 |
| | 41440024 | 30-JUN-10 | Actual-1000A-RO | | 413.98 | 0.00 | 216.68 | 630.66 |
| | | | Sub Total | | 963.80 | 0.00 | 505.05 | 1468.85 |
| JUL-2010 | 1146369 | 18-JUL-10 | GDS & INTERNET | | 13.80 | 0.00 | 6.87 | 20.67 |
| | TA0146369 | 18-JUL-10 | T/A COMMISSIONS | | 7.00 | 0.00 | 3.59 | 10.59 |
| | 41480144 | 31-JUL-10 | Actual-1210A-MA | | 199.04 | 0.00 | 101.95 | 300.99 |
| | 30475407 | 31-JUL-10 | JUL $4 WYN RWDS | | 4.00 | 0.00 | 1.98 | 5.98 |
| | 41478730 | 31-JUL-10 | Actual-1000A-RO | | 597.12 | 0.00 | 305.56 | 902.68 |

Page 3 of 14

Report Date : 12-JUL-13

ITEMIZED STATEMENT
------------------

Customer No :  10608-85840-02-KNI
Address    :   33 Kinard Bridge,LENOX,GA,31637,US
As of Date:    12-JUL-2013

| Mon-Year | Invoice No | Invoice Date | Description | Accrued Billing | Amount Tax | FinanceCharges | Total |
|----------|------------|--------------|-------------|---------|------------|----------------|-------|
|  | 41456592 | 31-JUL-10 | 5625A-PRM SUPPO | 93.45 | 0.00 | 46.91 | 140.36 |
|  | 41479799 | 31-JUL-10 | Actual-1800A-RE | 199.04 | 0.00 | 101.95 | 300.99 |
|  |  |  | Sub Total | 1113.45 | 0.00 | 568.81 | 1682.26 |
| AUG-2010 | 30477973 | 24-AUG-10 | O/A REINSPECTIO | 1700.00 | 0.00 | 827.45 | 2527.45 |
|  | 41506473 | 31-AUG-10 | Actual-1210A-MA | 133.70 | 0.00 | 65.08 | 198.78 |
|  | 30406046 | 31-AUG-10 | AUG-10 $4 VOICE | 8.00 | 0.00 | 3.82 | 11.82 |
|  | 41488022 | 31-AUG-10 | 5625A-PRM SUPPO | 93.45 | 0.00 | 45.50 | 138.95 |
|  | 30486372 | 31-AUG-10 | AUG $4 WYN RWDS | 8.00 | 0.00 | 3.82 | 11.82 |
|  | 41505274 | 31-AUG-10 | Actual-1000A-RO | 401.09 | 0.00 | 195.33 | 596.42 |
|  | 41507262 | 31-AUG-10 | Actual-1800A-RE | 133.70 | 0.00 | 65.08 | 198.78 |
|  |  |  | Sub Total | 2477.94 | 0.00 | 1206.08 | 3684.02 |
| SEP-2010 | 1159691 | 19-SEP-10 | GDS & INTERNET | 4.60 | 0.00 | 2.15 | 6.75 |
|  | 10498184 | 23-SEP-10 | GUEST SATISFACT | 39.19 | 0.00 | 18.54 | 57.73 |
|  | 10498185 | 23-SEP-10 | GUEST SRVCS TRA | 100.00 | 0.00 | 47.12 | 147.12 |
|  | 41521880 | 30-SEP-10 | 5625A-PRM SUPPO | 93.45 | 0.00 | 44.06 | 137.51 |
|  | 41546400 | 30-SEP-10 | Actual-1800A-RE | 119.41 | 0.00 | 56.24 | 175.65 |
|  | 41545384 | 30-SEP-10 | Actual-1210A-MA | 119.41 | 0.00 | 56.24 | 175.65 |
|  | 41544475 | 30-SEP-10 | Actual-1000A-RO | 358.23 | 0.00 | 168.74 | 526.97 |
|  |  |  | Sub Total | 834.29 | 0.00 | 393.09 | 1227.38 |
| OCT-2010 | 1166203 | 17-OCT-10 | GDS & INTERNET | 4.60 | 0.00 | 2.08 | 6.68 |

Page 5 of 17

| | | | | |
|---|---|---|---|---|
| TA0166203 | 17-OCT-10 | T/A COMMISSIONS | 7.20 | 0.00 | 3.27 | 10.47 |
| 41554060 | 31-OCT-10 | 5625A-PRM SUPPO | 93.45 | 0.00 | 42.65 | 136.10 |
| 41577578 | 31-OCT-10 | Actual-1800A-RE | 163.15 | 0.00 | 74.48 | 237.63 |
| 41578960 | 31-OCT-10 | Actual-1210A-MA | 163.15 | 0.00 | 74.48 | 237.63 |
| 41576718 | 31-OCT-10 | Actual-1000A-RO | 489.45 | 0.00 | 223.35 | 712.80 |

Report Date : 12-JUL-13

Page 4 of 14

ITEMIZED STATEMENT
----------------

Customer No : 10608-85840-02-KNI
Address : 33 Kinard Bridge,LENOX,GA,31637,US
As of Date: 12-JUL-2013

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | Sub Total | 921.00 | 0.00 | 420.31 | 1341.31 |
| NOV-2010 | 30507736 | 11-NOV-10 | Q/A REINSPECTIO | | 1700.00 | 0.00 | 775.60 | 2475.60 |
| | 1172915 | 21-NOV-10 | GDS & INTERNET | | 53.60 | 0.00 | 23.58 | 77.18 |
| | TA0172915 | 21-NOV-10 | T/A COMMISSIONS | | 56.90 | 0.00 | 25.03 | 81.93 |
| | TR0172915 | 21-NOV-10 | TMC / CONSORTIA | | 14.41 | 0.00 | 6.33 | 20.74 |
| | TC0172915 | 21-NOV-10 | T/A COMM SERVIC | | 4.26 | 0.00 | 1.90 | 6.16 |
| | 41596100 | 30-NOV-10 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 41.20 | 134.65 |
| | 41604022 | 30-NOV-10 | Actual-1210A-MA | | 147.36 | 0.00 | 61.74 | 209.10 |
| | 41605712 | 30-NOV-10 | Actual-1000A-RO | | 442.07 | 0.00 | 185.36 | 627.43 |
| | 41604506 | 30-NOV-10 | Actual-1800A-RE | | 147.36 | 0.00 | 61.74 | 209.10 |
| | | | | Sub Total | 2659.41 | 0.00 | 1182.48 | 3841.89 |
| DEC-2010 | 10513739 | 01-DEC-10 | GUEST SATISFACT | | 66.00 | 0.00 | 29.04 | 95.04 |

Page 6 of 17

| Invoice No | Invoice Date | Description | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|
| 10513740 | 01-DEC-10 | GUEST SRVCS TRA | 100.00 | 0.00 | 44.07 | 144.07 |
| TM0179588 | 20-DEC-10 | MEMBER BENEFIT | 15.20 | 0.00 | 6.55 | 21.75 |
| 1179588 | 20-DEC-10 | GDS & INTERNET | 37.80 | 0.00 | 16.17 | 53.97 |
| TA0179588 | 20-DEC-10 | T/A COMMISSIONS | 9.10 | 0.00 | 3.88 | 12.98 |
| 41637409 | 31-DEC-10 | Actual-1210A-MA | 112.37 | 0.00 | 51.66 | 164.03 |
| 41637697 | 31-DEC-10 | Actual-1800A-RE | 112.37 | 0.00 | 51.66 | 164.03 |
| 41636379 | 31-DEC-10 | Actual-1000A-RO | 337.12 | 0.00 | 155.09 | 492.21 |
| 41620806 | 31-DEC-10 | 5625A-PRM SUPPO | 93.45 | 0.00 | 39.75 | 133.20 |
| Sub Total | | | 883.41 | 0.00 | 397.87 | 1281.28 |
| JAN-2011 | | | | | | |
| 1186201 | 16-JAN-11 | GDS & INTERNET | 4.60 | 0.00 | 1.94 | 6.54 |
| TM0186201 | 16-JAN-11 | MEMBER BENEFIT | 3.60 | 0.00 | 1.56 | 5.16 |
| 41675304 | 31-JAN-11 | Actual-1800A-RE | 95.80 | 0.00 | 41.87 | 137.67 |
| 41679906 | 31-JAN-11 | Actual-1210A-MA | 95.80 | 0.00 | 41.87 | 137.67 |
| 41678838 | 31-JAN-11 | Actual-1000A-RO | 287.39 | 0.00 | 125.73 | 413.12 |
| 41653904 | 31-JAN-11 | 5625A-PRM SUPPO | 93.45 | 0.00 | 39.10 | 132.55 |

Report Date : 12-JUL-13

Page 5 of 14

ITEMIZED STATEMENT

Customer No  : 10608-85840-02-KNI
Address  :  33 Kinard Bridge,LENOX,GA,31637,US
As of Date:  12-JUL-2013

| Mon-Year | Invoice No | Invoice Date | Description | Accrued Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|
| | Sub Total | | | 580.64 | 0.00 | 252.07 | 832.71 |
| FEB-2011 | 10523780 | 16-FEB-11 | GUEST SRVCS TRA | 100.00 | 0.00 | 41.02 | 141.02 |
| | 10523782 | 16-FEB-11 | GUEST SATISFACT | 39.19 | 0.00 | 16.14 | 55.33 |
| | 10524772 | 24-FEB-11 | GUEST SRVCS TRA | 100.00 | 0.00 | 40.62 | 140.62 |

7/12/2013

https://oracle.wyndhamworldwide.com:8005/OA_CGI/FNDWRR.exe?temp_id=3688937598

| | | | | | | |
|---|---|---|---|---|---|---|
| 10524774 | 24-FEB-11 | GUEST SATISFACT | 45.00 | 0.00 | 18.36 | 63.36 |
| 41702011 | 28-FEB-11 | Actual-1800A-RE | 142.04 | 0.00 | 56.05 | 198.09 |
| 41701189 | 28-FEB-11 | Actual-1000A-RO | 426.12 | 0.00 | 168.21 | 594.33 |
| 41702691 | 28-FEB-11 | Actual-1210A-MA | 142.04 | 0.00 | 56.05 | 198.09 |
| 41691358 | 28-FEB-11 | 5625A-PRM SUPPO | 93.45 | 0.00 | 37.79 | 131.24 |
| | | Sub Total | 1087.84 | 0.00 | 434.24 | 1522.08 |
| **MAR-2011** | | | | | | |
| TA0199307 | 13-MAR-11 | T/A COMMISSIONS | 78.71 | 0.00 | 31.18 | 109.89 |
| 1199307 | 13-MAR-11 | GDS & INTERNET | 60.60 | 0.00 | 24.03 | 84.63 |
| TC0199307 | 13-MAR-11 | T/A COMM SERVIC | 5.89 | 0.00 | 2.33 | 8.22 |
| 23018390 | 22-MAR-11 | WYNREWARDS 5% | 6.32 | 0.00 | 2.49 | 8.81 |
| 10530749 | 24-MAR-11 | GUEST SRVCS TRA | 100.00 | 0.00 | 39.22 | 139.22 |
| 10530751 | 24-MAR-11 | GUEST SATISFACT | 40.00 | 0.00 | 15.69 | 55.69 |
| 41732178 | 31-MAR-11 | Actual-1000A-RO | 376.00 | 0.00 | 152.31 | 528.31 |
| 41737004 | 31-MAR-11 | Actual-1800A-RE | 125.33 | 0.00 | 50.74 | 176.07 |
| 41733449 | 31-MAR-11 | Actual-1210A-MA | 125.33 | 0.00 | 50.74 | 176.07 |
| 30560038 | 31-MAR-11 | PRM SUPPORT | 93.45 | 0.00 | 36.34 | 129.79 |
| | | Sub Total | 1011.63 | 0.00 | 405.07 | 1416.70 |
| **APR-2011** | | | | | | |
| 10534395 | 14-APR-11 | GUEST SATISFACT | 44.00 | 0.00 | 16.77 | 60.77 |
| 10534393 | 14-APR-11 | GUEST SRVCS TRA | 100.00 | 0.00 | 38.17 | 138.17 |
| 10537277 | 21-APR-11 | GUEST SATISFACT | 30.00 | 0.00 | 11.43 | 41.43 |
| 10537275 | 21-APR-11 | GUEST SRVCS TRA | 100.00 | 0.00 | 37.82 | 137.82 |
| TM0205927 | 27-APR-11 | MEMBER BENEFIT | 14.00 | 0.00 | 5.29 | 19.29 |
| 1205927 | 27-APR-11 | GDS & INTERNET | 20.40 | 0.00 | 7.74 | 28.14 |

Page 6 of 14

ITEMIZED STATEMENT
-------------------

Report Date : 12-JUL-13

Customer No : 10608-85840-02-KNI
Address : 33 Kinard Bridge,LENOX,GA,31637,US
As of Date: 12-JUL-2013

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | TCO205927 | 27-APR-11 | T/A COMM SERVIC | | 2.44 | 0.00 | 0.97 | 3.41 |
| | TA0205927 | 27-APR-11 | T/A COMMISSIONS | | 18.54 | 0.00 | 7.01 | 25.55 |
| | 41767992 | 30-APR-11 | Actual-1210A-MA | | 128.78 | 0.00 | 48.42 | 177.20 |
| | 41766505 | 30-APR-11 | Actual-1000A-RO | | 386.34 | 0.00 | 145.20 | 531.54 |
| | 41768509 | 30-APR-11 | Actual-1800A-RE | | 128.78 | 0.00 | 48.42 | 177.20 |
| | 30571223 | 30-APR-11 | PRM SUPPORT | | 93.45 | 0.00 | 34.94 | 128.39 |
| | | | | Sub Total | 1066.73 | 0.00 | 402.18 | 1468.91 |
| MAY-2011 | 10540275 | 12-MAY-11 | GUEST SATISFACT | | 40.00 | 0.00 | 14.71 | 54.71 |
| | 10540276 | 12-MAY-11 | GUEST SRVCS TRA | | 100.00 | 0.00 | 36.77 | 136.77 |
| | 10541972 | 19-MAY-11 | GUEST SRVCS TRA | | 100.00 | 0.00 | 36.42 | 136.42 |
| | 10541941 | 19-MAY-11 | GUEST SRVCS TRA | | 100.00 | 0.00 | 36.42 | 136.42 |
| | 10541971 | 19-MAY-11 | GUEST SATISFACT | | 20.00 | 0.00 | 7.28 | 27.28 |
| | 10541943 | 19-MAY-11 | GUEST SATISFACT | | 20.00 | 0.00 | 7.28 | 27.28 |
| | 1212572 | 27-MAY-11 | GDS & INTERNET | | 9.20 | 0.00 | 3.29 | 12.49 |
| | TA0212572 | 27-MAY-11 | T/A COMMISSIONS | | 3.82 | 0.00 | 1.41 | 5.23 |
| | 41799108 | 31-MAY-11 | Actual-1800A-RE | | 104.89 | 0.00 | 37.75 | 142.64 |
| | 41800689 | 31-MAY-11 | Actual-1210A-MA | | 104.89 | 0.00 | 37.75 | 142.64 |
| | 41799867 | 31-MAY-11 | Actual-1000A-RO | | 314.68 | 0.00 | 113.19 | 427.87 |
| | 41789545 | 31-MAY-11 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 33.49 | 126.94 |
| | | | | Sub Total | 1010.93 | 0.00 | 365.76 | 1376.69 |
| JUN-2011 | 41834484 | 30-JUN-11 | Actual-1000A-RO | | 257.43 | 0.00 | 89.82 | 347.25 |
| | 41834622 | 30-JUN-11 | Actual-1800A-RE | | 85.81 | 0.00 | 29.96 | 115.77 |
| | 41820815 | 30-JUN-11 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 32.09 | 125.54 |
| | 41835352 | 30-JUN-11 | Actual-1210A-MA | | 85.81 | 0.00 | 29.96 | 115.77 |
| | | | | Sub Total | 522.50 | 0.00 | 181.83 | 704.33 |
| JUL-2011 | TA0229960 | 10-JUL-11 | T/A COMMISSIONS | | 3.50 | 0.00 | 1.10 | 4.60 |
| | 1229960 | 10-JUL-11 | GDS & INTERNET | | 4.60 | 0.00 | 1.53 | 6.13 |

https://oracle.wyndhamworldwide.com:8005/OA_CGI/FNDWRR.exe?temp_id=3688937598

7/12/2013

Report Date : 12-JUL-13

ITEMIZED STATEMENT
--------------------

Customer No :   10608-85840-02-KNI
Address :       33 Kinard Bridge,LENOX,GA,31637,US
As of Date:     12-JUL-2013

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
|          | 10555552   | 28-JUL-11 | GUEST SRVCS TRA |  | 100.00 | 0.00 | 32.92 | 132.92 |
|          | 10555554   | 28-JUL-11 | GUEST SATISFACT |  | 39.19 | 0.00 | 12.95 | 52.14 |
|          | 41863042   | 31-JUL-11 | Actual-1800A-RE |  | 129.08 | 0.00 | 42.32 | 171.40 |
|          | 41862040   | 31-JUL-11 | Actual-1000A-RO |  | 387.25 | 0.00 | 126.90 | 514.15 |
|          | 41847211   | 31-JUL-11 | 5625A-PRM SUPPO |  | 93.45 | 0.00 | 30.64 | 124.09 |
|          | 41863535   | 31-JUL-11 | Actual-1210A-MA |  | 129.08 | 0.00 | 42.32 | 171.40 |
|          |            |           | Sub Total |  | 886.15 | 0.00 | 290.68 | 1176.83 |
| AUG-2011 | 10557373   | 04-AUG-11 | GUEST SATISFACT |  | 40.00 | 0.00 | 13.03 | 53.03 |
|          | 10557371   | 04-AUG-11 | GUEST SRVCS TRA |  | 100.00 | 0.00 | 32.57 | 132.57 |
|          | 41902340   | 31-AUG-11 | Actual-1800A-RE |  | 96.47 | 0.00 | 30.19 | 126.66 |
|          | 41900926   | 31-AUG-11 | Actual-1000A-RO |  | 289.42 | 0.00 | 90.40 | 379.82 |
|          | 41901832   | 31-AUG-11 | Actual-1210A-MA |  | 96.47 | 0.00 | 30.19 | 126.66 |
|          | 41883614   | 31-AUG-11 | 5625A-PRM SUPPO |  | 93.45 | 0.00 | 29.19 | 122.64 |
|          |            |           | Sub Total |  | 715.81 | 0.00 | 225.57 | 941.38 |
| SEP-2011 | 30621613   | 15-SEP-11 | ONLINE LRNG LIB |  | 50.00 | 0.00 | 15.30 | 65.30 |
|          | 23020363   | 22-SEP-11 | WYNREWARDS 5% |  | 5.25 | 0.00 | 1.57 | 6.82 |
|          | 30630336   | 28-SEP-11 | GLOBAL CONFEREN |  | 999.00 | 0.00 | 213.01 | 1212.01 |
|          | 41904993   | 30-SEP-11 | 5625A-PRM SUPPO |  | 93.45 | 0.00 | 27.79 | 121.24 |
|          | 41930920   | 30-SEP-11 | Actual-1800A-RE |  | 69.04 | 0.00 | 20.54 | 89.58 |
|          | 41932866   | 30-SEP-11 | Actual-1000A-RO |  | 207.12 | 0.00 | 61.58 | 268.70 |
|          | 41933211   | 30-SEP-11 | Actual-1210A-MA |  | 69.04 | 0.00 | 20.54 | 89.58 |
|          |            |           | Sub Total |  | 1492.90 | 0.00 | 360.33 | 1853.23 |

Page 8 of 14

ITEMIZED STATEMENT

Customer No :    10608-85840-02-KNI
Address :        33 Kinard Bridge,LENOX,GA,31637,US
As of Date:      12-JUL-2013

Report Date : 12-JUL-13

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|-------------|-------------|---------|---------|------------|----------------|-------|
| OCT-2011 | 10577079 | 27-OCT-11 | GUEST SRVCS TRA | | 100.00 | 0.00 | 28.37 | 128.37 |
| | 10577147 | 27-OCT-11 | GUEST SATISFACT | | 35.00 | 0.00 | 9.92 | 44.92 |
| | 41959318 | 31-OCT-11 | Actual-1000A-RO | | 344.05 | 0.00 | 96.90 | 440.95 |
| | 41961495 | 31-OCT-11 | Actual-1800A-RE | | 114.68 | 0.00 | 32.34 | 147.02 |
| | 41943114 | 31-OCT-11 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 26.34 | 119.79 |
| | | | Sub Total | | 801.86 | 0.00 | 226.21 | 1028.07 |
| | 41960796 | 31-OCT-11 | Actual-1210A-MA | | 114.68 | 0.00 | 32.34 | 147.02 |
| NOV-2011 | 41994973 | 30-NOV-11 | Accrual-1210A-M | * | 173.34 | 0.00 | 46.27 | 219.61 |
| | 41990795 | 30-NOV-11 | Accrual-1800A-R | * | 173.34 | 0.00 | 46.27 | 219.61 |
| | 41991236 | 30-NOV-11 | Accrual-1000A-R | * | 520.02 | 0.00 | 138.70 | 658.72 |
| | 41978407 | 30-NOV-11 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 24.94 | 118.39 |
| | | | Sub Total | | 960.15 | 0.00 | 256.18 | 1216.33 |
| DEC-2011 | 10586434 | 21-DEC-11 | GUEST SRVCS TRA | | 100.00 | 0.00 | 25.62 | 125.62 |
| | 10586436 | 21-DEC-11 | GUEST SATISFACT | | 100.00 | 0.00 | 25.62 | 125.62 |
| | 1259080 | 28-DEC-11 | GDS & INTERNET | | 4.60 | 0.00 | 1.15 | 5.75 |
| | 42019230 | 31-DEC-11 | Accrual-1000A-R | * | 380.03 | 0.00 | 95.47 | 475.50 |
| | 42021415 | 31-DEC-11 | Accrual-1210A-M | * | 126.68 | 0.00 | 31.79 | 158.47 |

Page 11 of 17

| Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|
| 42021455 | 31-DEC-11 | Accrual-1800A-R | * | 126.68 | 0.00 | 31.79 | 158.47 |
| 42005517 | 31-DEC-11 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 23.49 | 116.94 |
| | | Sub Total | | 931.44 | 0.00 | 234.93 | 1166.37 |
| **JAN-2012** | | | | | | | |
| 10591277 | 30-JAN-12 | GUEST SATISFACT | | (100.00) | 0.00 | 0.00 | (100.00) |
| 42058724 | 31-JAN-12 | Accrual-1800A-R | * | 102.66 | 0.00 | 24.19 | 126.85 |
| 42053310 | 31-JAN-12 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 22.03 | 115.48 |
| 42057882 | 31-JAN-12 | Accrual-1210A-M | * | 102.66 | 0.00 | 24.19 | 126.85 |
| 42056298 | 31-JAN-12 | Accrual-1000A-R | * | 307.98 | 0.00 | 72.57 | 380.55 |
| | | Sub Total | | 506.75 | 0.00 | 142.98 | 649.73 |
| **FEB-2012** | | | | | | | |
| 42090097 | 29-FEB-12 | Accrual-1000A-R | * | 457.02 | 0.00 | 101.10 | 558.12 |
| 42066820 | 29-FEB-12 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 20.68 | 114.13 |

Page 9 of 14

Report Date : 12-JUL-13

ITEMIZED STATEMENT
----------------

Customer No :   10608-85840-02-KNI
Address :       33 Kinard Bridge, LENOX, GA, 31637, US
As of Date:     12-JUL-2013

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 42087661 | 29-FEB-12 | Accrual-1210A-M | * | 152.34 | 0.00 | 33.71 | 186.05 |
| | 42088948 | 29-FEB-12 | Accrual-1800A-R | * | 152.34 | 0.00 | 33.71 | 186.05 |
| | | | Sub Total | | 855.15 | 0.00 | 189.20 | 1044.35 |
| MAR-2012 | 10596215 | 15-MAR-12 | GUEST SRVCS TRA | | 100.00 | 0.00 | 21.37 | 121.37 |

Page 12 of 17

```
                30673216   15-MAR-12   GLOBAL CONFEREN        100.00    0.00    21.32    121.32
                10596214   15-MAR-12   GUEST SATISFACT         50.00    0.00    10.73     60.73
                42113841   31-MAR-12   Accrual-1210A-M    *   127.71    0.00    26.30    154.01
                42096628   31-MAR-12   5625A-PRM SUPPO         93.45    0.00    19.23    112.68
                42115370   31-MAR-12   Accrual-1800A-R    *   127.71    0.00    26.30    154.01
                42112751   31-MAR-12   Accrual-1000A-R    *   383.13    0.00    78.84    461.97
                                                            ========  ======  ======   ========
                                        Sub Total            982.00    0.00   204.09   1186.09
                                                            ========  ======  ======   ========

     APR-2012   10600886   05-APR-12   GUEST SRVCS TRA        100.00    0.00    20.32    120.32
                10600885   05-APR-12   GUEST SATISFACT         30.00    0.00     6.14     36.14
                42147071   30-APR-12   Accrual-1000A-R    *   380.66    0.00    72.61    453.27
                42148542   30-APR-12   Accrual-1210A-M    *   126.89    0.00    24.22    151.11
                42149435   30-APR-12   Accrual-1800A-R    *   126.89    0.00    24.22    151.11
                42124147   30-APR-12   5625A-PRM SUPPO         93.45    0.00    17.83    111.28
                                                            ========  ======  ======   ========
                                        Sub Total            857.89    0.00   165.34   1023.23
                                                            ========  ======  ======   ========

     MAY-2012   42175968   31-MAY-12   Accrual-1210A-M    *   113.69    0.00    19.91    133.60
                42165339   31-MAY-12   5625A-PRM SUPPO         93.45    0.00    16.38    109.83
                42176466   31-MAY-12   Accrual-1800A-R    *   113.69    0.00    19.91    133.60
                42174319   31-MAY-12   Accrual-1000A-R    *   341.06    0.00    59.80    400.86
                                                            ========  ======  ======   ========
                                        Sub Total            661.89    0.00   116.00    777.89
                                                            ========  ======  ======   ========
```

Page 10 of 14

ITEMIZED STATEMENT
-----------------

Report Date : 12-JUL-13

Customer No :   10608-85840-02-KNI
Address :       33 Kinard Bridge,LENOX,GA,31637,US
As of Date:     12-JUL-2013

Page 13 of 17

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|-----------|----------------|-------|
| JUN-2012 | 42213036 | 30-JUN-12 | Accrual-1210A-M | * | 88.92 | 0.00 | 14.24 | 103.16 |
| | 42211845 | 30-JUN-12 | Accrual-1000A-R | * | 266.76 | 0.00 | 42.70 | 309.46 |
| | 42214116 | 30-JUN-12 | Accrual-1800A-R | * | 88.92 | 0.00 | 14.24 | 103.16 |
| | 42195519 | 30-JUN-12 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 14.98 | 108.43 |
| | | | Sub Total | | 538.05 | 0.00 | 86.16 | 624.21 |
| JUL-2012 | 42220181 | 30-JUL-12 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 13.57 | 107.02 |
| | 42238365 | 31-JUL-12 | Accrual-1210A-M | * | 148.10 | 0.00 | 21.45 | 169.55 |
| | 42236751 | 31-JUL-12 | Accrual-1800A-R | * | 148.10 | 0.00 | 21.45 | 169.55 |
| | 42237799 | 31-JUL-12 | Accrual-1000A-R | * | 444.29 | 0.00 | 64.31 | 508.60 |
| | | | Sub Total | | 833.94 | 0.00 | 120.78 | 954.72 |
| AUG-2012 | 23024525 | 22-AUG-12 | WYNREWARDS 5% | | 5.90 | 0.00 | 0.78 | 6.68 |
| | 10630351 | 23-AUG-12 | GUEST SRVCS TRA | | 100.00 | 0.00 | 13.32 | 113.32 |
| | 10630353 | 23-AUG-12 | GUEST SATISFACT | | 50.00 | 0.00 | 6.69 | 56.69 |
| | 42270004 | 31-AUG-12 | Accrual-1000A-R | * | 348.80 | 0.00 | 45.09 | 393.89 |
| | 42270722 | 31-AUG-12 | Accrual-1210A-M | * | 116.27 | 0.00 | 15.01 | 131.28 |
| | 42271319 | 31-AUG-12 | Accrual-1800A-R | * | 116.27 | 0.00 | 15.01 | 131.28 |
| | 42257047 | 31-AUG-12 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 12.08 | 105.53 |
| | | | Sub Total | | 830.69 | 0.00 | 107.98 | 938.67 |
| SEP-2012 | 10635634 | 13-SEP-12 | GUEST SATISFACT | | 40.00 | 0.00 | 4.91 | 44.91 |
| | 10635635 | 13-SEP-12 | GUEST SRVCS TRA | | 100.00 | 0.00 | 12.27 | 112.27 |
| | 42305911 | 30-SEP-12 | Accrual-1000A-R | * | 236.61 | 0.00 | 27.03 | 263.64 |
| | 42285732 | 30-SEP-12 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 10.68 | 104.13 |
| | 42306281 | 30-SEP-12 | Accrual-1210A-M | * | 78.87 | 0.00 | 8.99 | 87.86 |
| | 42306681 | 30-SEP-12 | Accrual-1800A-R | * | 78.87 | 0.00 | 8.99 | 87.86 |

Page 11 of 14

ITEMIZED STATEMENT
-----------------

Customer No  : 10608-85840-02-KNI
Address :      33 Kinard Bridge,LENOX,GA,31637,US
As of Date:    12-JUL-2013

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | Sub Total | 627.80 | 0.00 | 72.87 | 700.67 |
| OCT-2012 | 30722839 | 02-OCT-12 | ONLINE LRNG LIB | | 50.00 | 0.00 | 5.68 | 55.68 |
| | 42332975 | 31-OCT-12 | Accrual-1800A-R | * | 125.00 | 0.00 | 12.33 | 137.33 |
| | 42332009 | 31-OCT-12 | Accrual-1000A-R | * | 374.99 | 0.00 | 36.92 | 411.91 |
| | 42334668 | 31-OCT-12 | Accrual-1210A-M | * | 125.00 | 0.00 | 12.33 | 137.33 |
| | 42318569 | 31-OCT-12 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 9.21 | 102.66 |
| | | | Sub Total | | 768.44 | 0.00 | 76.47 | 844.91 |
| NOV-2012 | 23025596 | 22-NOV-12 | WYNREWARDS 5% | | 3.48 | 0.00 | 0.29 | 3.77 |
| | 10649912 | 28-NOV-12 | GUEST SRVCS TRA | | 100.00 | 0.00 | 8.45 | 108.45 |
| | 10649914 | 28-NOV-12 | GUEST SATISFACT | | 15.00 | 0.00 | 1.27 | 16.27 |
| | 42367087 | 30-NOV-12 | Accrual-1210A-M | * | 640.76 | 0.00 | 53.50 | 694.26 |
| | 42366386 | 30-NOV-12 | Accrual-1800A-R | * | 640.76 | 0.00 | 53.50 | 694.26 |
| | 42368799 | 30-NOV-12 | Accrual-1000A-R | * | 1922.27 | 0.00 | 160.52 | 2082.79 |
| | 42345756 | 30-NOV-12 | 5625A-PRM SUPPO | * | 93.45 | 0.00 | 7.81 | 101.26 |
| | | | Sub Total | | 3415.72 | 0.00 | 285.34 | 3701.06 |
| DEC-2012 | 10651558 | 12-DEC-12 | GUEST SATISFACT | | 25.00 | 0.00 | 1.95 | 26.95 |
| | 10651516 | 12-DEC-12 | GUEST SRVCS TRA | | 100.00 | 0.00 | 7.75 | 107.75 |
| | 42395539 | 31-DEC-12 | Accrual-1000A-R | * | 1693.49 | 0.00 | 115.16 | 1808.65 |
| | 42396592 | 31-DEC-12 | Accrual-1210A-M | * | 564.50 | 0.00 | 38.39 | 602.89 |
| | 42396556 | 31-DEC-12 | Accrual-1800A-R | * | 564.50 | 0.00 | 38.39 | 602.89 |

|  | 42378024 | 31-DEC-12 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 6.36 | 99.81 |
|  |  |  | Sub Total | | 3040.94 | 0.00 | 208.00 | 3248.94 |
| JAN-2013 | 42402067 | 31-JAN-13 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 4.91 | 98.36 |

Page 12 of 14

ITEMIZED STATEMENT
-------------------

Customer No : 10608-85840-02-KNI
Address : 33 Kinard Bridge,LENOX,GA,31637,US
As of Date: 12-JUL-2013

Report Date : 12-JUL-13

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|----------|------------|--------------|-------------|---------|---------|------------|----------------|-------|
|  | 42425888 | 31-JAN-13 | Accrual-1800A-R | * | 519.15 | 0.00 | 27.26 | 546.41 |
|  | 42427222 | 31-JAN-13 | Accrual-1210A-M | * | 519.15 | 0.00 | 27.26 | 546.41 |
|  | 42424785 | 31-JAN-13 | Accrual-1000A-R | * | 1557.45 | 0.00 | 81.76 | 1639.21 |
|  |  |  | Sub Total | | 2689.20 | 0.00 | 141.19 | 2830.39 |
| FEB-2013 | 42455943 | 28-FEB-13 | Accrual-1000A-R | * | 1649.34 | 0.00 | 63.49 | 1712.83 |
|  | 42455946 | 28-FEB-13 | Accrual-1210A-M | * | 549.78 | 0.00 | 21.17 | 570.95 |
|  | 42455945 | 28-FEB-13 | Accrual-1800A-R | * | 549.78 | 0.00 | 21.17 | 570.95 |
|  | 42441705 | 28-FEB-13 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 3.60 | 97.05 |
|  |  |  | Sub Total | | 2842.35 | 0.00 | 109.43 | 2951.78 |
| MAR-2013 | 42489678 | 31-MAR-13 | Accrual-1210A-M | * | 711.24 | 0.00 | 16.35 | 727.59 |
|  | 42489676 | 31-MAR-13 | Accrual-1000A-R | * | 2133.72 | 0.00 | 49.07 | 2182.79 |
|  | 42489677 | 31-MAR-13 | Accrual-1800A-R | * | 711.24 | 0.00 | 16.35 | 727.59 |

| | 42471860 | 31-MAR-13 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 2.15 | 95.60 |
| | | | | | 3649.65 | 0.00 | 83.92 | 3733.57 |
| | | | Sub Total | | | | | |
| APR-2013 | 30784939 | 05-APR-13 | GLOBAL CONFEREN | | 1049.00 | 0.00 | 0.00 | 1049.00 |
| | 42518715 | 30-APR-13 | Accrual-1000A-R | * | 2018.88 | 0.00 | 16.15 | 2035.03 |
| | 42502768 | 30-APR-13 | 5625A-PRM SUPPO | | 93.45 | 0.00 | 0.75 | 94.20 |
| | 42518717 | 30-APR-13 | Accrual-1210A-M | * | 672.96 | 0.00 | 5.38 | 678.34 |
| | 42518716 | 30-APR-13 | Accrual-1800A-R | * | 672.96 | 0.00 | 5.38 | 678.34 |
| | | | Sub Total | | 4507.25 | 0.00 | 27.66 | 4534.91 |
| MAY-2013 | 42526255 | 31-MAY-13 | 5625A-PRM SUPPO | * | 93.45 | 0.00 | 0.00 | 93.45 |
| | 42547971 | 31-MAY-13 | Accrual-1210A-M | * | 667.34 | 0.00 | 0.00 | 667.34 |
| | 42548225 | 31-MAY-13 | Accrual-1000A-R | * | 2002.01 | 0.00 | 0.00 | 2002.01 |

Page 13 of 14

Report Date : 12-JUL-13

ITEMIZED STATEMENT
------------------

Customer No : 10608-85840-02-KNI
Address :   33 Kinard Bridge,LENOX,GA,31637,US
As of Date: 12-JUL-2013

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | 42547970 | 31-MAY-13 | Accrual-1800A-R | * | 667.34 | 0.00 | 0.00 | 667.34 |
| | | | Sub Total | | 3430.14 | 0.00 | 0.00 | 3430.14 |
| JUN-2013 | 30803281 | 13-JUN-13 | ONLINE LRNG LIB | | 60.00 | 0.00 | 0.00 | 60.00 |
| | 42577253 | 30-JUN-13 | Accrual-1000A-R | * | 2114.24 | 0.00 | 0.00 | 2114.24 |

```
                                                                                      93.45
42559750        30-JUN-13    5625A-PRM SUPPO              93.45    0.00       0.00    704.75
42577814        30-JUN-13    Accrual-1210A-M    *        704.75    0.00       0.00    704.75
42577813        30-JUN-13    Accrual-1800A-R    *        704.75    0.00       0.00
                                                       ========  ========   ========  ========
                             Sub Total                  3677.19    0.00       0.00    3677.19
                                                       ========  ========   ========  ========

                                                       ========  ========   ========  ========
                             Grand Total               61888.95   44.80    13972.44  75906.19
                                                       ========  ========   ========  ========
```

Requested By: Geraldine Lyon

* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

******* END OF REPORT *******

Page 14 of 14



## Shipment Receipt

Transaction Date: 12 Jul 2013                    Tracking Number:        1Z22445X0196365559

### 1  Address Information

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Laxmi Krupa, Inc. | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Ramesh Sheth | Gerri Lyon | Gerri Lyon |
| 601 W Central Avenue | 22 Sylvan Way | 22 Sylvan Way |
| LENOX GA 316379256 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| Telephone:229-546-4223 | Telephone:(973) 753-7377 | Telephone:(973) 753-7377 |

### 2  Package Information

| | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|---|
| 1. | Letter | UPS Letter | | Reference # 1 - 006-5072 |

### 3  UPS Shipping Service and Shipping Options

| Service: | UPS Next Day Air |
|---|---|
| Guaranteed By: | 12:00 PM Monday, Jul 15, 2013 |
| Shipping Fees Subtotal: | 33.89 USD |
|    Transportation | 28.80 USD |
|    Fuel Surcharge | 2.94 USD |
|    Delivery Area Surcharge- Extended | |
|       Package 1 | 2.15 USD |

### 4  Payment Information

Bill Shipping Charges to:
Shipper's Account 22445X

A discount has been applied to the Daily rates for this shipment

| Total Charged: | 33.89 USD |
|---|---|
| Negotiated Total: | 9.11 USD |

Note: Your invoice may vary from the displayed reference rates.
* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.